I must tell you with regrets and apologies that an emergency has intervened. Judge Reyna will not be able to sit with us. He will listen to our arguments and will participate in our deliberations. He's provided us with a list of some points that he'd like us to be sure to ask you to cover, and we will do so. So, again, with apologies on behalf of all of us and with your agreement, we will continue with the program. OK. The first argued case this morning is number 162181, In Re William D. Hober. Mr. Boyd. Thank you, and good morning, Your Honors. My name is Thomas Boyd. I'm here on behalf of the appellant, William D. Hober, Inc. This appeal involves an application to register a uniquely designed trigger guard that has acquired distinctiveness in the custom gun market, and I want to stress that. We're seeking protection just in the custom gun market. We're not seeking to register all trigger guard configurations, and we're not seeking protection across the entire gun market, just the custom gun market, which caters to gunsmiths who assemble custom guns and gun aficionados who purchase and collect those guns. Now, you say that it's a very specific construction or configuration, and yet, isn't it the picture that defines the mark, not the words that you use to describe it? We agree with that. That's absolutely right, and in fact, when we initially filed the application, we just described it as a distinctive trigger guard profile. We amended the description to be responsive to the examining attorney, not because we were seeking greater protection, and it is just the design that we're seeking to protect, and just with regard to the custom gun market. This case, and I'll get right to the heart of functionality, there are issues relating to whether it's a functional design and also acquired distinctiveness, but turning to functionality. The determination as to functionality in this case is not only controlled by the Morton Norwich products case, but the treatment of this application is very similar and analogous to the way in which the examining attorney and the board treated the application in Morton Norwich. In that case, the examining attorney and the board steadfastly refused to accept that the design of the spray bottle for application of household cleaning supplies could be non-functional. Instead of relying on evidence, as this court recognized, the examining attorney and the board each expressed mere opinions and not an iota of evidence. That's what's occurred in this case. You treat the Morton Norwich factors as a balancing test. What support do you have for that proposition? The case itself, Morton Norwich described that discussion as a discussion of the principles of law that must be applied and discussed the development of the case law in that area. I understand that the government is now describing Morton Norwich as more of a survey and a non-exclusive listing of factors, but in fact, the decision itself speaks for itself. It's referring to the principles of law, it states that, the principles of law that must be applied to this analysis. And that has been the tradition. And for that matter, those are the factors that the examining attorney applied. When the examining attorney asked my client to provide information, the attorney asked for the information relating to those four factors. So those have been the factors at issue in this case. Let me focus on this issue of the presence or absence of a utility patent. Clearly, the presence of a utility patent is meaningful under Morton Norwich. What authority do you have for the proposition that the absence of a utility patent is important? Again, Morton Norwich, which starts with the proposition that the government has the burden to establish a prima facie case. And so Morton Norwich says one way to meet that burden is to demonstrate that there had been some utility patent at some point. Now, I don't have a case that says the absence of a utility patent demonstrates non-functionality, but it does demonstrate that the government has failed to meet its burden on that factor. Well, it demonstrates that as to that particular factor that Morton Norwich said might be one thing you could point to, they're not able to point to that factor, but it's not a negative implication, is it? It's not a negative implication per se, but again, I would also point out that's the first factor. And in most cases, that's the death knell. If there's been a utility patent, it's very difficult to get past functionality. And typically, when you have a utility patent, you also have advertising touting functionality. We have none of those here. In the most recent case that this court has decided, on this issue, the Becton Dickinson Company case, which the government relies on quite a bit, those were the factors that demonstrated the prima facie case, a utility patent and advertising touting the functionality. We had none of those here, which again brings me back to my threshold and central point. The government didn't meet its burden to establish a prima facie case that this particular design of this particular trigger guard in the custom gun market is functional, the design. Instead, they bypassed that entire analysis and just declared all trigger guards are functional, all trigger guards are ovals and loops, and therefore, we can't tell the difference. In fairness, the board was focused, under Morton Norwich, on the competition as being the crux of the inquiry. And, you know, there is, you have to, the government puts in a chart from their red brief that certainly shows that they're all at least oval shaped or loop shaped. I mean, I don't really see what is so unique about the mark that you're proposing. And you and I and the examining attorney and the board may be of that opinion, but we're not. You don't know how much I shoot. I'm sorry. You can guess, it's probably not a lot. But if you were like I and don't shoot and I'm not an aficionado, I would look at that more generally. But a gunsmith and a collector in this market doesn't see it as an oval or a loop. They see it as a bow. And we've submitted 35 declarations from gunsmiths and gun aficionados who say this is a recognized bow profile. There's no reference to loops or ovals. So the fact that the board- Have you submitted the same declarations to say that all the rest of these competitors wouldn't be characterized as a bow profile? No, because we didn't have this survey that's appeared in the appellate's brief. But this isn't the problem that the board felt that acquired distinctiveness, the characteristics of trademarks rather than patents, had not been adequately established. That's correct. This is really what it's about, is it not? Because we don't know and it was conspicuous that there was no application for a design patent. But design patents have a short life and whether or not it's available, it's easy to understand why a trademark would be a preferable direction. But there is a heavier, more significant burden, is there not, of market recognition and distinctiveness. And when one looks at the pictures of all of the other guards, it is that this is a small difference that experts or perhaps people in this field would recognize. Isn't that the burden that had to be met? On the second issue, with regard to acquired distinctiveness. Yes. And we recognize that when we get to that inquiry, the burden is on the applicant to establish that it's acquired distinctiveness. With regard to that page 28 of their brief with all of the different photos, I would submit there is no evidence that those are photos of trigger guards that are used in the custom gun market. For example, if there are Remingtons in there that sell for $45 to $100 as compared to ours, which sells for about $400. But isn't that burden on the applicant? The burden certainly is. To show all of the distinctions that you're telling us? That's correct. And we believe that the declarations... Did you define the genus for your marks as defined by a price point? We did in the sense that it's the custom gun market. It's recognized by the board that guns of this quality typically sell for thousands of dollars, north of even $10,000, and that the trigger guard that we supply to the custom gun market sells for $400 plus. But I'm trying to understand why that makes a difference in terms of what it looks like and whether it serves a function. Well, it makes a difference in terms of the discerning clientele. Somebody in the custom gun market, whether it's a gunsmith or an aficionado, is going to have a more discerning eye when they're buying a trigger guard for $400 as opposed to a mass-produced trigger guard that Remington might sell for $50 or $100. Another aspect which comes to mind is that, in fact, with experience and with time, the distinctiveness, the public recognition, whether one decides which weapon they're going to buy because of the looks of the trigger guard, if, in fact, that is a factor that can be demonstrated with time, then you're not really out of court, so to speak, at this stage. If the court reverses on functionality, that's correct. Well, it might be that you haven't overcome a presumption of functionality which does trigger guard as a function, and the fact that it's got a little notch in it or whatever doesn't make much of an impression, perhaps, on those who aren't operating in this field. Respectfully, I would point out it's not a presumption of functionality. It's a presumption that it's not functional, and the burden is on the government to establish that our design is functional. They have the burden, not us, and they fail to meet their burden. We believe the court should reverse the government on functionality. Distinctiveness, the acquired distinctiveness, is not relevant to the functionality question, is it? I believe some of the evidence can address both, but they are separate issues. That's correct. And your price point and custom gun market goes to acquired distinctiveness, right? Well, it also goes to the fourth factor of Morton Norwich. The government conceded that as the record demonstrates, and this is the board conceded in the opinion, that the record established that our costs are higher, and therefore the comparative cheapness, if that's a poor word, but the comparative expense does not favor a finding of functionality. And I don't want to leave your question unanswered, but I'd like to preserve some time for rebuttal if I may. Yes. Okay. Let's hear from the government. Thank you. Mr. Casagrande. Good morning, and may it please the court. I just wanted to, he said it was the government's burden to prove functionality. It's the government's burden to show a prima facie case of functionality, and what's in the record are four definitions of trigger guards as a loop surrounding a trigger, a kind of loop, a loop, a semicircular band of metal. So there are four definitions, and then there are dozens, literally dozens of trigger guards from third parties that meet that definition. So what we've got here is a case where the general shape is functional and there are only insignificant parts of it that are potentially arbitrary, according to Hober. I have a question, though, about the record. You say that you actually, the board actually found that the trigger guard, or that the design makes the trigger guard stronger or more durable, and they also said that it has its shape because it works better in that shape. But I didn't see any actual evidence in the record to support those sort of generalized conclusions. There were really two things that they said, and they were not on this third Morton Norwich factor, which they said was the primary consideration, but they were talking about kind of what the, in the absence of a patent, saying what the shape does. They were saying, well, it's pretty obvious to us that if it widens where it attaches to the bottom of the gun, that increases its strength, which, as we pointed out in our brief, is basically almost a common sense scientific fact. And they also said that it's got to be a little bit wider at the front where you have that latch, where you have that little pivot. When you say they, the board said this. The board said this. The board said it's a little bit wider at the front to accommodate the pivot point for the latch that releases the bottom metal from the front of the bottom metal of the trigger guard, which is not claimed in this thing. So those are general observations they were making, but they're not really pertinent to the primary thing. So you're saying the board just used its own expertise to reach this conclusion? On those two, it was essentially making common sense observations that you could see from the picture or the drawing of the mark itself, but they weren't part of the third Morton Norwich factor upon which they primarily made their decision. Okay. So do we need to rely on those findings as it relates to functionality since they're really not based on any evidence in the record? You don't need to rely on them to find that this was a functional design, no. All right. What about when if the third factor relates to competition, and I know we've said in value engineering that that's really the crux of the inquiry, what about the fact that there are apparently different gun markets, a custom gun market versus a non-custom gun market? I don't know that the evidence shows that there is a custom gun market. In fact, there was a small blog post they put in from, I think, Field and Stream magazine that basically was giving advice to first-time buyers of custom guns about things they should think about before they go ahead and get one because, obviously, they're prestigious to have because they're very expensive. And so I don't know that there's a clean break between what they want to define as a custom gun market and a gun market in general. I don't think it's prohibited that something that serves a purpose also serves a trademark role. And they're not saying that by so doing, that would be the end of the trigger guard markets. As your record showed, there are dozens of trigger guards, and they look to the unskilled eye pretty similar to this one. However, experts and participants might see an additional value. But I was taken by the issue of proof of acquired distinctiveness. So would you again review for us the board's reasoning on that? Okay. Before I get to the acquired distinctiveness, I just wanted to amplify that. I think there was some conflation of what the market impact was on functionality, and really the fact that it might be a very specific market doesn't really affect the functionality inquiry. An oval trigger guard is there to protect the trigger. It doesn't matter whether a first-time gun shooter is using it or a custom gun aficionado. But as to acquired distinctiveness, which was your question, I think, first of all, it has to be substantially exclusive use, and it has to be continuous use. And what we've got in the record is so many similar-looking trigger guards. And, in fact, to my eye, three of them are identical. And so you don't have substantially exclusive use. But neither you nor I, perhaps, is an active participant in this field. There were representations from those who, to what might look to me as a small difference, might consider it a large difference, that it was significant. None of them, whether it was Mr. Hober's declaration or any of the customers in the custom gun industry who had a lot of experience, none of them explained what it was that made the difference. They all said, oh, it's distinctive, but they did not explain what it was. And that's one of the things that the board relied upon, was the fact that none of these people could actually explain what made this different. And, in fact, the appellant tried to do that by taking a picture of the mark without the dotted-out stuff and putting in, essentially, a description of different parts of it. And as we pointed out in our brief, that applies to all the other Orvals as well. So there's nothing about how they defined it. Even they couldn't define what it was that made these different. So, to me... But the trademark application would be not for whatever it is that made it different, but for the picture of the trigger guard, is it not? That's correct, Your Honor. Are there any other, it's not in the record that I could find, anyway, but are there any other registered marks for trigger guard designs? We couldn't find any. They put in some evidence of entire handguns, and they also put in evidence that a couple of their prior registrations incorporate a trigger guard design, but it's not the same one that we have before us here. So beyond that, I didn't see anything. Am I correct that the record does talk about advertising expenditures, but there's nothing in the record that ties the advertising expenditures just to the trigger guard? That's correct, Your Honor. First of all, there's just a snapshot of one, essentially a web page in 2013 or a couple of web pages. On those, the most prominent thing on the page is Swift Blackburn, which is their word mark, and then there are pictures of the guns in which they say, look for the bow profile, but as we also pointed out, that could be said of any of the other ones. So that is not a way to distinguish these particular gun trigger guards. Secondary meaning required distinctive is something that develops over time, and we don't have anything in the record from what Mr. Blackburn did between 1964 and 2011. There are no advertisements, no pictures of him at trade shows, nothing to indicate what he did to basically educate the people in the market he was selling to, this is what my trigger guard is. We don't have any sales data whatsoever. We don't have how much was spent on advertising, and there's something interesting in one of the articles that the appellant put in that talked about the transaction in which Mr. Blackburn sold his rights to the Hober Company, and that was that there were long gaps in the availability of this trigger guard. And then they quoted Mr. Hober saying, and now that I've got it, you'll be able to get the product. So that seems to undercut continuous use as well. If there are no further questions. Any more questions? Let me just see if I can summarize. The position is that it is not necessarily excluded from access to the trademark law, but that there was a failure of proof of trademark use and entitlement? Yes, exactly. It's not a per se rule that trigger guards or oval trigger guards, you know, themselves are incapable. For example, if you had a trigger guard where take the trigger guard that they have and there were little stars etched into the side of it, that part of it could be potentially a trademark, kind of like a Louis Vuitton handbag that has LV etched into the fabric on the side of it. But that's not what we have here. They're coming in just for the basic shape of an oval. So it was a failure of proof. Okay. Thank you. Thank you. Mr. Boyd, perhaps the question is whether such proof would be more reasonably available with the passage of time or whether the issue is impossible for the proof. On acquired distinctiveness? Yes. I believe that the record provides that evidence now, but certainly with additional time we would be able to provide further evidence and greater support to demonstrate acquired distinctiveness. Mr. Blackburn's declaration, I think, is quite clear. He's been designing and making this trigger guard since the 1960s, and he states clearly he's been doing so continuously and exclusively. And the people, his clients and others in the custom gun market, have commented to him throughout that time how distinctive the trigger guard is and how they recognize his trigger guard even without seeing his name. Do you agree with me or agree with my reading of the record that there's nothing in the record that indicates that the advertising that you say you have expended is tied to the trigger guard? I would disagree with that. The advertising touts the unique design, the iconic. Among many other things. Well, when we're talking about the trigger guard, the trigger guard is all we sell. We sell ammunition, but in terms of gun metal and other gun parts, it's the trigger guard. And we describe it consistently as the bow-shaped profile that is distinctive, that is iconic, that has come to be recognized for its quality in the custom gun market. So our advertising dwells on that. It says nothing about touting functionality. It's quite a bit about touting the unique design. With regard to whether or not we're seeking protection just in the custom gun market and whether there is such a market, prior to this appeal, that was undisputed. In the board's decision on page 2, they recognize that we're just seeking protection for custom guns. And on page 29 of the board's decision, they recognize, quote, the relevant purchasing public would comprise consumers who are knowledgeable about custom guns and are willing to pay an appropriate amount of money for them. The board recognized that in their decision with regard to acquired distinctiveness. In terms of the government's criticism that none of the declarants explained what was unique or what was iconic, that's not necessary. Ford didn't explain what was unique about the roofline. And they were able to get that registered for their Ford Mustang. But we have done more than that. The declarants have said what is unique is the bow-shaped design. And, again, to the layperson, maybe trigger guards look like ovals and loops. But all 35 of these declarants have said to us it looks like a bow, not just a bow but a distinctive bow, that bows out to the left, to my left, towards the butt of the rifle. And that is unique. To us, that's the Blackburn signature. Going back to one additional point on functionality, there was some discussion about whether or not our design provides greater durability or strength. There's no evidence in the record to support that. That was something that wasn't even discussed or raised by the examining attorney or at any time prior to the argument before the board, at which time one of the board members or one of the members on the panel posited that as a possibility. But there's no evidence to support that. I believe I'm running over my time. But to just add another moment or so, is this a matter of copying and imitation? I'm trying to understand. In fact, it seems to me as a layperson that a custom gun is not, or any gun, is not purchased because of what on its face looks like a small, to me, barely discernible difference in the trigger guard. And so what would be achieved if you prevail on this issue? You're not saying that having this trademark trigger guard is something that's going to make a difference to the consumer. It will. We're saying that it does make a difference to the consumer. Again, stressing that we're talking about the custom gun market. So these are custom-made guns that have to be unique. So by definition, this has to be a custom-made and unique piece, as opposed to a trigger guard that another gunsmith might make. This has to be unique. The design is necessarily important to the gunsmith who assembles the gun and to the aficionado who collects and purchases these guns. So the design, all rifles need a trigger guard. There's no dispute about that. But what's unique is our design, the look-for design, that everyone in this custom market associates with Blackburn. Why didn't you try to file on the supplemental register? Because we believed that it was not functional and that we had acquired distinctiveness. If this court holds that the government erred on functionality and reverses on that, but you conclude that we haven't met our burden on acquired distinctiveness, then we would ask that you remand and permit us to amend to the supplemental register. Okay. Thank you. Thank you very much for your time. The case is taken into submission.